**08 CV 02867**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUNSHINE WIRE AND CABLE DEFINED BENEFIT PENSION PLAN TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MF GLOBAL, LTD., MAN GROUP PLC, KEVIN R. DAVIS, AMY S. BUTTE, ALISON J. CARNWATH, CHRISTOPHER J. SMITH, CHRISTOPHER BATES, HENRI J. STEENKAMP and EDWARD L. GOLDBERG,<br><br>Defendants. | <br><br>CIVIL ACTION NO.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff alleges the following based upon the investigation of Plaintiff's counsel. The investigation included a review of United States Securities and Exchange Commission ("SEC") filings, regulatory filings and reports, securities analysts' reports, public statements, and media reports. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action seeking redress under the strict liability provisions of the federal securities laws on behalf of all purchasers of MF Global, Ltd. ("MF" or the "Company") common stock pursuant or traceable to the Registration Statement and Prospectus issued in connection with the Company's Initial Public Offering on or about July 19, 2007 ("IPO") and through February 28, 2008 (the "Class" and the "Class Period" respectively).

2.      The Registration Statement and Prospectus issued in connection with the IPO were materially false and misleading, and/or omitted material information necessary to make the statements made, in light of such material omissions, not materially false and misleading.

## JURISDICTION AND VENUE

3.      The claims asserted herein arise under and pursuant to Sections 11, 12(2) and 15 of the Securities Act of 1933, as amended (the "Securities Act"), 15 U.S.C. §§ 77k, 77l, and 77o.

4.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

5.      Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). Pursuant to 28 U.S.C. § 1391(d), MF and Man Group plc may properly be sued in any District in the United States, including the Southern District of New York. Moreover, MF's principal executive offices are located in New York City and its common stock trades on the New York Stock Exchange ("NYSE"), which is located in this District. Thus, venue is proper in this District.

6.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

7.      Plaintiff Sunshine Wire and Cable Defined Benefit Pension Plan Trust, as set forth in the attached certification, purchased shares of MF pursuant to the false and misleading Registration Statement and Prospectus and was damaged thereby.

8.      Defendant MF is a Hamilton, Bermuda registered company with its principal

executive offices in New York, New York. The Company was formerly known as Man Financial, the brokerage arm of the British hedge fund Man Group plc, and was spun off to form its own publicly traded company via its IPO. MF, through its wholly owned subsidiaries, is the world's leading broker of exchange-listed futures and options. It provides execution and clearing services for exchange-traded and over-the-counter ("OTC") derivative products, as well as for non-derivative foreign exchange products and securities in the cash market. MF is a "specialty" broker, whose focus is on providing both brokerage execution and clearing services to its clients. It does not engage in non-brokerage businesses, such as investment banking, asset management, or principal investments.

9. MF's common stock trades on the New York Stock Exchange under the ticker symbol "MF."

10. Defendant Man Group plc ("Man") is the former parent of MF. Man received almost $3 billion of proceeds from the IPO and still retains a 20% stake in MF. Through its ownership and control of the Company, Man is a controlling person of MF within the meaning of the Securities Act.

11. Defendant Kevin R. Davis ("Davis") was at all relevant times herein the Company's Chief Executive Officer and Director and in such capacity signed the Registration Statement.

12. Defendant Amy S. Butte ("Butte") was at all relevant times herein the Company's Chief Financial Officer and Director, and in such capacity signed the Registration Statement.

13. Defendant Alison J. Carnwath ("Carnwath") was at all relevant times herein the Company's Non-Executive Chairman of the Board of Directors and in such capacity signed the Registration Statement.

14. Defendant Christopher J. Smith ("Smith") was at all relevant times herein the Company's Chief Operating Officer, Deputy Chief Executive Officer and Director and in such capacity signed the Registration Statement.

15. Defendant Christopher Bates ("Bates") was at all relevant times herein the Company's Group Controller and in such capacity signed the Registration Statement.

16. Defendant Henri J. Steenkamp ("Steenkamp") was at all relevant times herein the Company's Vice President of Corporate Financial Reporting – MF's Principal Accounting Officer – and in such capacity signed the Registration Statement.

17. Defendant Edward L. Goldberg ("Goldberg") was at all relevant times herein a member of the Company's Board of Directors and was listed in the Registration Statement and Prospectus in that capacity.

18. Davis, Butte, Carnwath, Smith, Bates, Steenkamp and Goldberg are collectively referred to hereinafter as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

19. On July 18, 2007, MF announced that the IPO of 97,379,765 shares of its common stock had been priced at $30 per share, for gross proceeds of more than $2.92 billion, and that the shares would begin trading the following day, July 19, 2007. Prior to the IPO, no public market existed for trading of the Company's securities.

20. The Registration Statement and Prospectus represented:

> We are exposed to numerous risks in the ordinary course of our business. Management believes that effective risk management is critical to the success of our business. We have a comprehensive risk management structure and processes to monitor, evaluate and manage the principal risks we assume in conducting our business.

21. Similarly, the Registration Statement and Prospectus represented that "We have established a robust, globally integrated risk-management infrastructure to monitor, evaluate and

4

manage the principal risks we assume in conducting our business around the world."

22. The Registration Statement and Prospectus further represented in pertinent part:

> Our risk-management methods focus on monitoring each client's potential exposure at default - that is, our potential exposure to loss in the event that the client defaults - and adjusting that client's margin requirements accordingly in an effort to ensure that their collateral is sufficient to secure their performance obligations on their open positions. This function requires, among other things, that we properly record and verify hundreds of thousands of transactions and events each day, and that we continuously monitor and evaluate the size and nature of our clients' positions and the associated risks . . . . Our risk-management methods are based on internally developed controls, observed historical market behavior and what we believe to be industry practices.

23. The Registration Statement and Prospectus further represented that "Our clients are required to maintain margin accounts with collateral sufficient to support their open trading positions."

24. Under the heading "Disciplined Approach to Risk," the Registration Statement and Prospectus further represented:

> We actively manage risk on a global basis with a centralized, hands-on approach. Our senior executives play a leading role in managing our risk exposure on a day-to-day basis. We monitor our clients' open positions - which represent our principal risk exposure - and margin levels on a real-time basis, with both sophisticated technical systems as well as continuous oversight from our highly experienced risk managers. Client positions are reviewed and margin levels adjusted both during and at the end of each trading day. We do not rely primarily on conventional value at-risk methodology to test our clients' exposures, as that methodology attempts to measure risk under relatively "normal" market conditions during a relatively brief period and may not always reflect significant "shock" events that may have occurred over a longer time frame. Rather, we stress-test client positions under hypothetical "worst-case" conditions that reflect actual historical data from periods extending back a decade or longer. We believe this approach enables us to measure risk in light of a broader range of historical experience that includes more extreme conditions.

25. The Registration Statement and Prospectus further represented:

> Overall, we believe that our exposure to market risk is substantially lower

5

than it would be if we took positions for our own account primarily for directional purposes rather than primarily to facilitate client trades on a matched basis and to hedge and manage our corporate assets.

26. The Registration Statement and Prospectus further represented:

Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation. We have an active program for monitoring and verifying that our employees and introducing brokers comply with specified procedures. . . .

27. On August 14, 2007, less than a month after the IPO, MF issued a press release stating that:

As an organization, MF Global prides itself on its rigorous approach to risk management, an essential function that has allowed us to operate successfully for more than 200 years. One of the key components of our risk management is daily assessments of credit and counter party risks, as well as general market trends.

28. Unbeknownst to investors, however, the Registration Statement and Prospectus issued in connection with the IPO was materially false and misleading because, among other things, it materially misrepresented MF's risk management policies, procedures, and systems; falsely described them as disciplined, comprehensive and effective; falsely represented that it manages its exposure to risk with a centralized, hands-on approach; falsely represented that it monitors clients' open positions and margin levels on a real-time basis, with both sophisticated technical systems as well as continuous oversight by highly experienced risk managers; falsely represented that its risk management methods conform to industry practices; falsely represented that its clients are required to maintain margin accounts with collateral sufficient to support their open trading positions; failed to disclose that in an effort to speed trades and be "efficient," MF had suspended or eliminated its own internal risk management technical and human controls and supervision; and failed to disclose that it eliminated credit and risk analysis and buying power limits and controls from its systems, effectively allowing any MF employee to place orders

6

without regard to the account's satisfaction of margin requirements, collateral, or ability to pay.

## THE TRUTH IS REVEALED

29. On February 28, 2008, the end of the Class Period, MF issued a press release at approximately 8:30 A.M. announcing that it was taking a $141.5 million bad debt provision because in a period of only six or seven hours in the previous morning a day-trading MF broker logged on to his personal computer at home in Olive Branch, Mississippi and speculated in wheat futures in his personal account at MF, buying approximately 15,000 to 20,000 futures contracts (the equivalent of approximately 10% of the market for these contracts for any given month), in violation of his authorized trading limit and without having the necessary collateral or capital "to support even a fraction of his positions." The lack of risk management, technical controls and human oversight, and the elimination of credit and risk analysis and buying power limits and controls that were supposed to be part of the Company's order entry system enabled the broker to make more than 100 trades and place a massive bet on more than $800 million to $1 billion worth of wheat, "significant positions in his own account which were liquidated later that morning. The unauthorized activity resulted in him incurring a loss of $141.5 million, which the company, as a clearing member, is responsible to settle at the clearinghouse."

30. The registered representative was later identified as Evan "Brent" Dooley ("Dooley"), who was quoted by *The Wall Street Journal* on February 28, 2008 as saying that "'The computer system failed on a lot of things,' adding that it had problems in 'setting limits.'"

31. The Company hosted a conference call later that day for analysts and investors. As reported by *The Wall Street Journal* on February 29, 2008, in that call Defendant Davis "acknowledged that existing internal controls could have stopped Mr. Dooley's trades from being processed - but were turned off in a few cases to allow for speedier transactions by brokers

7

at the firm who traded for themselves or took customer orders by phone." The internal controls did not fail; rather, they were **deactivated**. During the call, Davis further stated that Dooley had just one "historic customer," who had not done any trading business in "some time."

32. Davis, who observed that "this is an absolutely awful event," acknowledged that Dooley had not circumvented any risk management procedures that had been in place, and that in order to speed trades the Company had allowed some internal terminals "to not have the buying power control." He went on to say that the policy clearly was "a mistake." MF had sacrificed security for efficiency and in so doing placed all of MF's assets at risk.

33. Following the Company's announcement, Fitch Ratings issued a Rating Watch Negative on MF, stating that the $141.5 million "loss questions the robustness of risk measurement systems [touted by MF in the Registration Statement and Prospectus (see ¶ 21 herein)] and represents a substantial portion of net income level." Eileen Fahey, a managing director at Fitch Ratings, observed: "This does open the view that their customers are taking more risk than we thought." In addition, numerous analysts expressed reservations and concerns regarding the company's Risk Management practices. Bank of America said "the questions raised around the company's risk-management practices are likely to keep the stock depressed for quite some time," and Credit Suisse analysts said the "magnitude of the loss is clearly disconcerting to us and calls into question the degree of risk taking and risk management at the franchise."

34. MF's stock closed down 28% that day from previous trading levels. However, the very next day, Friday, February 28, MF's shares sank a further 17%, to close at $17.55, after trading as low as $14.27 per share, completing a two-day plunge of approximately 40%, and representing a loss to shareholders of more than $1,142,000,000.

35. The repercussions of MF's trading scandal will continue to reverberate. As reported by *The Wall Street Journal* on March 1, 2008:

> Clients who make trades through MF Global because of its longtime reputation as a savvy player in the topsy-turvy futures industry might take that business elsewhere, though there is no sign of a customer exodus . . . . Analysts and investors are concerned that more bad trades could surface at MF Global, further depleting the firm's capital . . . . The trading loss also could complicate MF Global's plans to borrow money later this year. Standard & Poor's lowered its long-term counter-party credit rating on MF Global to triple-B, down one notch from triple-B-plus, noting that the brokerage firm had borrowed $150 million under its $1.5 billion, five-year, revolving credit facility to bolster its regulatory capital.

36. On March 2, 2008, MF wrote a letter to its clients concerning the "disappointing and embarrassing development in the history of MF Global." The letter, written by Davis, said "We have always prided ourselves on our strong risk management approach, as it is at the heart of our business model. An occurrence such as this is not acceptable."

37. On March 5, 2008, *The Wall Street Journal* reported that federal law-enforcement authorities are investigating the futures trades made by Dooley. The probe is being conducted by the U.S. Attorney's office for the Northern District of Illinois in Chicago. An investigation is also being conducted by the Chicago Mercantile Exchange and the Commodities Futures Trading Commission.

38. The market continues to react. On March 17, 2008, shares of MF began trading at $15.79 and, by noon, had traded as low as $3.64 per share, nearly 80% below the previous day's closing price of $17.35. Commenting on this steep decline, *The Wall Street Journal* again observed that "analysts and investors are concerned that more bad trades could surface at MF Global, further depleting its capital."

39. Further commenting on the Company's stock performance, CNBC reported on March 17, 2008 that there may be "more to the story" of the rogue trader given the "huge drop"

in the Company's share price which "doesn't correlate with the rest of the market."

40. MF's shares closed on March 17, 2008 at $6.05, down more than 65%.

## CLASS ACTION ALLEGATIONS

41. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased shares of MF common stock pursuant to the Registration Statement and Prospectus issued in connection with MF's IPO through and including February 28, 2008. Excluded from the Class are defendants; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

42. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MF's shares were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MF or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

44. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a) whether the federal securities laws were violated by defendants' acts as alleged herein;

    (b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about MF and its risk management policies, procedures, and systems;

    (c) whether Man and the Individual Defendants are controlling persons of MF within the meaning of § 15 of the Securities Act; and

    (d) to what extent the members of the Class have sustained damages and the proper measure of damages.

46. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**FIRST CLAIM**
**Violation of Section 11 of**
**The Securities Act Against All Defendants**

47. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48. Individual Defendants as signatories of the Registration Statement, as directors and/or officers of MF, and controlling persons of the issuer, owed to the holders of the shares obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became

11

effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

49. None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

50. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

51. As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of MF's shares sold in the IPO was artificially inflated, and Plaintiff and the Class suffered substantial damage in connection with their ownership of MF's shares pursuant to the Registration Statement.

52. MF is the issuer of the shares sold via the Registration Statement. As issuer of the shares, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

53. At the times they obtained their shares of MF, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

54. This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

55. By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

## SECOND CLAIM
### Violation of Section 12(a)(2) of The Securities Act Against All Defendants

56. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57. This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

58. Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the MF IPO Registration Statement.

59. The MF IPO Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The Individual Defendants' actions of solicitation included participating in the preparation of the false the misleading Registration Statement.

60. Defendants owed to the purchasers of MF's shares, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the IPO materials, including the Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in

the IPO materials as set forth above.

61.     Plaintiff and other members of the Class purchased or otherwise acquired MF's shares pursuant to and/or traceable to the defective Registration Statement. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

62.     Plaintiff, individually and representatively, hereby offers to tender to defendants those shares which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such shares, in return for the consideration paid for those shares together with interest thereon. Class members who have sold their MF shares are entitled to rescissory damages.

63.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold MF's shares purchased in the IPO have the right to rescind and recover the consideration paid for their MF shares, and hereby elect to rescind and tender their MF shares to the defendants sued herein. Plaintiff and Class members who have sold their MF shares are entitled to rescissory damages.

64.     This action is brought within three years from the time that the shares upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CLAIM
### Violation of Section 15 of The Securities Act
### Against the Individual Defendants

65.     Plaintiff repeats and realleges each and every allegation contained above.

66.     This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

67. Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of MF within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause MF to engage in the acts described herein.

68. Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

69. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A. declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B. appointing Plaintiff as lead plaintiff and class representative and its counsel as lead class counsel;

C. awarding Plaintiff and other members of the Class damages together with pre-judgment interest thereon;

D. awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E. awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: New York, New York
      March 18, 2008

                        Respectfully submitted,

                        COHEN, MILSTEIN, HAUSFELD
                        & TOLL, P.L.L.C.

                        _____
                        Lynda J. Grant (LG-4784)
                        150 East 52nd Street, 30th Floor
                        New York, N.Y. 10022
                        Telephone: (212) 838-7797
                        Facsimile: (212) 838-7745
                        lgrant@cmht.com

                        Steven J. Toll
                        S. Douglas Bunch
                        1100 New York Avenue, N.W.
                        West Tower, Suite 500
                        Washington, D.C. 20005
                        Telephone: (202) 408-4600
                        Facsimile: (202) 408-4699
                        stoll@cmht.com
                        dbunch@cmht.com

                        ***Attorneys for Plaintiffs***

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Ira Gaines, as Trustee of the Sunshine Wire & Cable Defined Benefit Pension Plan Trust ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. I have reviewed a class action complaint asserting securities claims against MF Global, Ltd. ("MF Global"), and wish to join as a plaintiff retaining Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as my counsel.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in MF Global during the Class Period of July 19, 2007 through February 28, 2008 were as follows:

| DATE | TRANSACTION (buy/sell) | NO. OF SHARES | PRICE PER SHARE |
| --- | --- | --- | --- |
| 7/19/07 | Buy | 600 | $30.00 |

5. During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing true and correct.

Executed this 14th day of March, 2008.

Ira Gaines

357946.1 1